JEFF POFF,

                      Plaintiff,

v.                                                       Case No. 25-cv-137-pp

WYATT WEADGE, *et al.*,

                      Defendants.

**ORDER GRANTING PLAINTIFF'S FIRST MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING AS UNNECESSARY PLAINTIFF'S SECOND MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 13) AND SCREENING AMENDED COMPLAINT (DKT. NO. 12) UNDER 28 U.S.C. §1915A**

      Plaintiff Jeff Poff, who is incarcerated at Waupun Correctional Institution and is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights. On February 25, 2025, the court received the plaintiff's amended complaint. Dkt. No. 12. Under Federal Rule of Civil Procedure 15, "[a] party may amend its pleading once as a matter of course" within twenty-one days of service of the complaint or of a responsive pleading. Fed. R. Civ. P. 15(a)(1). Because at the time it received the amended complaint, the court had not screened the original complaint or ordered service on any defendant, the plaintiff has the right to amend his complaint as a matter of course, without the court's permission. This decision resolves the plaintiff's motions for leave to proceed without prepaying the filing fee, dkt. nos. 2, 13, and screens the amended complaint, dkt. no. 12.

I.   **Motions for Leave to Proceed without Prepaying the Filing Fee (Dkt. Nos. 2, 13)**

The Prison Litigation Reform Act (PLRA) applies to this case because the plaintiff was incarcerated when he filed his complaint. See 28 U.S.C. §1915(h). The PLRA lets the court allow an incarcerated plaintiff to proceed with without prepaying the civil case filing fee. 28 U.S.C. §1915(a)(2). When funds exist, the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b)(1). He then must pay the balance of the $350 filing fee over time, through deductions from his prison trust account. Id.

On February 4, 2025, the court ordered the plaintiff to pay an initial partial filing fee of $1.67. Dkt. No. 5. The court received that fee on April 11, 2025. The court will grant the plaintiff's first motion for leave to proceed without prepaying the filing fee (Dkt. No. 2) and will deny as unnecessary his second motion for leave to proceed without prepaying the filing fee (Dkt. No. 13). The court will require the plaintiff to pay the remainder of the filing fee over time in the manner explained at the end of this order.

II.  **Screening the Amended Complaint**

   A.   Federal Screening Standard

Under the PLRA, the court must screen complaints brought by incarcerated persons seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the incarcerated person raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be

granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

In determining whether the amended complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, the amended complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The amended complaint must contain enough facts, "accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less

stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B. The Plaintiff's Allegations

The amended complaint concerns events that allegedly occurred while the plaintiff was incarcerated at the Wisconsin Secure Program Facility (WSPF). Dkt. No. 12 at ¶2. The plaintiff has sued Correctional Officers Wyatt Weadge, Captain Fedie, Lieutenant Brown Lucas, Warden Gary Boughton, Security Director Jacob Cirian, Sergeant Mellum, Sergeant Mezzenette, Sergeant Mativa, Sergeant Waldera, Correctional Officer Wilkerson, Correctional Officer Laxton, Restricted Housing Unit Manager Brown, complaint examiners E. Ray and R. Boyer and two John Doe defendants. Id. at ¶¶3–16. The plaintiff sues the defendants in their individual capacities. Id.

The plaintiff alleges that at around 10:00 p.m. on December 8, 2022, Officer Weadge mistakenly gave the plaintiff a memorandum about a disciplinary hearing that Weadge was facing "for violating work related ethic rules" in front of Captain Fedie. Id. at ¶17. The plaintiff pressed his emergency call button to ask Sergeant Waldera to speak with a supervisor. Id. at ¶18. Waldera told the plaintiff that the supervisor (Fedie) was not available but that someone else would speak with him the next day. Id. at ¶19. Waldera then asked the plaintiff "what his 'intentions' were" regarding the memo, and the plaintiff quickly responded that he had changed his mind and flushed the memo down the toilet. Id. at ¶20. Waldera allegedly told the plaintiff "that was

4

a good decision because 'something little like that' could make a person's life a living hell." Id.

The next morning, while officers escorted the plaintiff to recreation, Sergeant Mativa allegedly began to question the plaintiff about the disciplinary memo after Waldera gave him a "head's up." Id. at ¶21. The plaintiff says that he "assured Mativa" that he had flushed the memo down the toilet and that "everything was 'cool.'" Id. Mativa allegedly responded, "'yeah it better be,' for your own safety." Id. (emphasis omitted). The plaintiff says that an hour and half later, when Mativa was taking him back to his cell, Mativa told him that his property had been moved to a new cell where he would have a new cellmate. Id. The plaintiff says that this cellmate is the person that Weadge was accused of falsifying a conduct report against, which resulted in the disciplinary hearing mentioned in the misdelivered memo. Id.

The plaintiff alleges that later that day, Sergeant Mezzenette came to his new cell and demanded that he turn over the Weadge memo or Mezzenette would "make his life a living hell." Id. at ¶22. The plaintiff responded in Spanish that he did not have anything and was not scared of Mezzenette or anyone else. Id. That night, the plaintiff wrote requests to send to Warden Boughton, Director Cirian and Unit Manager Brown about the events from December 8 and 9, 2022. Id. at ¶23. The plaintiff requested a transfer to a different institution for fear of his safety and of retaliation from Weadge and the other officers. Id. On December 20, Boughton responded and told the plaintiff

that although this was a "potentially embarrass[s]ing" event for Weadge, it "did not constitute a 'marked incident at institution level.'" Id. (emphasis omitted).

The plaintiff alleges that on December 13, 2022, Waldera's voice came on the speaker in the plaintiff's cell, and Waldera told the plaintiff that he (the plaintiff) had lied, and that Waldera does not "like it when people lie to [him], now you gona [*sic*] meet the wrath of DOC." Id. at ¶24. The plaintiff then asked his new cellmate if he had heard Waldera's threat, and the cellmate said that he had. Id. The plaintiff says that he and his cellmate stayed up late and "fished" the memo to each other, so the cellmate "could later use on possible future litigation as evidence for falsesifying [*sic*] a conduct report against him." Id.

The plaintiff says that on December 27, 2022, while he was on recreation, Weadge left his post and went to the plaintiff's cell "on the haunt [*sic*] for the di[s]ciplinary memo he had mistakenly given to" the plaintiff on December 8. Id. at ¶25. When Weadge was unable to find the memo, he "decided to even further violate DOC policy, and a direct order from Def. Boughton" and asked Fedie to conduct a second cell search and "an illegal strip search" and confiscated the plaintiff's property that evening. Id. (emphasis omitted). The plaintiff says that at about 8:00 that evening, Fedie, Weadge, Waldera, Officers Wilkerson and Laxton, Sergeant Mellum and the Doe officers came to his cell and ordered him to leave. Id. The plaintiff alleges that those officers still did not find the memo, so Wilkerson, Fedie, Waldera and Weadge "decided to steal, and or destroyed" half of the plaintiff's property. Id. at ¶26.

6

He says that he is missing trial transcripts, headphones, shoes, hygiene items, clothes, family photos and other items totaling $2,000 in value. Id.

The plaintiff separately alleges that Weadge retaliated against him on December 12 by opening outgoing legal mail for his criminal appeal and attempting to fabricate another conduct report. Id. at ¶27. He further alleges that in January 2023, he had a scheduled Zoom call with his mother. Id. at ¶28. He claims that Weadge again left his post and cancelled the plaintiff's Zoom call. Id. The plaintiff says that he repeatedly wrote to Boughton, Cirian and Brown about Weadge's harassment and retaliation, but that none of them responded or did anything to address Weadge's actions. Id. at ¶29. The plaintiff alleges that the day after the officers stole his property, Lieutenant Brown Lucas told him that Weadge fabricated another conduct report against the plaintiff for being in possession of the memo. Id. at ¶30. He says that Brown Lucas told him that Brown Lucas would talk to Cirian about getting the conduct report dismissed but could not promise the plaintiff anything. Id.

The plaintiff claims that Weadge, Waldera, Mativa, Mezzenette and Fedie acted in "concert with each other" to harass, intimidate, target, threaten and harm him to conceal Weadge's actions that led to the disciplinary memorandum that Weadge mistakenly delivered to the plaintiff. Id. at ¶32. He says that these actions constituted retaliation and cruel and unusual punishment in violation of the plaintiff's rights under the First and Eighth Amendments. Id. The plaintiff says that Weadge, Waldera, Wilkerson, Fedie, Laxton and the Doe officers illegally searched his cell, strip-searched him and

7

stole his property in retaliation and in violation of his rights under the First, Fourth and Eighth Amendments. Id. at ¶33. The plaintiff claims that Boughton, Cirian and Brown Lucas failed to intervene and investigate the plaintiff's requests and complaints about Weadge's actions in violation of his rights under the Eighth Amendment. Id. at ¶34. He claims that Weadge opened his legal mail and delayed his criminal appeal in an effort to have that appeal dismissed, fabricated conduct reports against him to keep him in segregation and cancelled his Zoom meeting with his mother all "to inflict pain" and violate the plaintiff's rights under the First and Eighth Amendments. Id. at ¶35. Finally, he claims that E. Ray and R. Boyer failed to investigate the claims in his grievances and falsified unspecified documents. Id. at ¶36. The plaintiff seeks compensatory and punitive damages against all defendants. Id. at p.12.

C. Analysis

The plaintiff first alleges that defendants Weadge, Waldera, Mativa, Mezzenette and Fedie harassed him after Weadge mistakenly gave the plaintiff papers concerning a disciplinary hearing that Weadge faced. He says that the officers told him that his life would be difficult if he said anything about the memo or asked questions about it. This kind of verbal abuse or harassment from prison officials violates the Eight Amendment only in exceptional circumstances. See Lisle v. Welborn, 933 F.3d 705, 719 (7th Cir. 2019) (citing Beal v. Foster, 803 F.3d 356, 357–58 (7th Cir. 2015)). For example, lying to an incarcerated person about having brain cancer or about his family being killed in a car crash might violate the Eighth Amendment. See Beal, 803 F.3d at 357.

Or guards who use derogatory terms that increase "the likelihood of sexual assaults on him" could violate an incarcerated person's rights. Hughes v. Farris, 809 F.3d 330, 334 (7th Cir. 2015) (internal quotation omitted). The common thread in these cases is that the harassment must involve physical harm, a threat of harm, psychological abuse or other extreme circumstances.

The plaintiff's allegations come closest to those from Dobbey v. Ill. Dep't of Corr., 574 F.3d 443, 446 (7th Cir. 2009), where a Black incarcerated person alleged that a White prison guard hung a noose in the prison and gave him "evil eyes." The Seventh Circuit compared this incident to two from the Eighth Circuit—one where a guard pointed a gun at a Black incarcerated person, cocked it, called him a racial slur and repeatedly threatened to shoot him; and another where a guard "threatened to kill [an incarcerated person], repeatedly offered a bounty to any prisoner who would assault him, and gave a prisoner a razor blade with which to assault him." Id. (citing Burton v. Livingston, 791 F.2d 97, 100–01 (8th Cir. 1986); and Irving v. Dormire, 519 F.3d 441, 445, 449–50 (8th Cir. 2008)). The Seventh Circuit concluded that, although "[t]he line between 'mere' harassment and 'cruel and unusual punishment' is fuzzy . . . the incident with the noose and the 'evil eyes' falls on the harassment side of the line because it was not a credible threat to kill, or to inflict any other physical injury." Id.

The plaintiff's allegations likewise fall short of the mark for an Eighth Amendment violation. He says that the defendants asked him about the memorandum that he mistakenly received from Weadge, and that the plaintiff

told them that he had disposed of it by flushing it down the toilet. In response, the defendants allegedly told the plaintiff that it was good he did that because otherwise it "could make a person's life a living hell" or pose a risk to "[the plaintiff's] own safety," staff would "make his life a living hell" or that he would face "the wrath of DOC." But the plaintiff says that these threats were made to keep him from bringing up the memo again, not because he destroyed it. Nor does the plaintiff allege that any of these threats were accompanied by a description of any specific harm that the plaintiff would face. Like the incarcerated plaintiff in Dobbey, the plaintiff likely felt harassed and afraid, but "harassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment. Nor does it inflict injury comparable in gravity to failing to provide a prisoner with adequate medical care or with reasonable protection against the violence of other prisoners." Id. The court finds that the plaintiff does not state an Eighth Amendment claim against the defendants based on their comments to him about the Weadge memo.

The plaintiff also alleges that the defendants violated his rights by searching his cell without cause and strip-searching him. But incarcerated persons do not have a right to privacy "within the confines of the prison cell," Hudson v. Palmer, 468 U.S. 517, 526 (1984), so the search of the plaintiff's cell could not have violated the Fourth Amendment. The plaintiff does have a "right to bodily privacy during visual inspections, subject to reasonable intrusions that the realities of incarceration often demand." Henry v. Hulett, 969 F.3d 769, 779 (7th Cir. 2020). Similarly, searches of incarcerated persons may violate the

Eighth Amendment if they are "maliciously motivated, unrelated to institutional security, and lack a legitimate penological justification." Rivera v. Drake, 497 F. App'x 635, 637 (7th Cir. 2012) (citing Hope v. Pelzer, 536 U.S. 730, 737 (2002); and Whitman v. Nesic, 368 F.3d 931, 934 (7th Cir. 2004)). But the plaintiff does not say anything about the strip-search to suggest that it was performed unreasonably or maliciously. He labels it "illegal" but does not elaborate and explain what made it illegal. He says that officers strip-searched him while looking for the misdelivered memo, which could be a legitimate penological justification. The plaintiff's unsupported conclusion that the search was illegal is not entitled to the presumption of truth, see Iqbal, 556 U.S. at 679, and is not enough to state a claim under the Fourth or Eighth Amendment.

The plaintiff alleges that the defendants stole or destroyed his property during the search of his cell. He suggests that this violated his rights under the Fourteenth Amendment. But claims for deprivation of property are not actionable under §1983 if adequate state remedies are available to redress the deprivation, even if the property is taken intentionally. Morris v. Scott, 840 F. App'x 14, 15 (7th Cir. 2021) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984); and Wynn v. Southward, 251 F.3d 588, 592–93 (7th Cir. 2001)) ("Unauthorized deprivations of property violate the due-process clause only when no post-deprivation procedures are available."). The State of Wisconsin "provides several post-deprivation procedures for challenging the taking of property." Cole v. Litscher, 343 F. Supp. 2d 733, 742 (W.D. Wis. 2004) (citing

Wis. Const. art. I, §9; Wis. Stat. §§810 and 893). That means the plaintiff must seek relief for his stolen or destroyed property in state court.

The plaintiff also alleges that the officers' actions constituted retaliation, which could violate the First Amendment. See Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). To state a claim of retaliation, the plaintiff must allege facts showing that "he engaged in a protected activity," "he suffered a deprivation likely to prevent future protected activity" and "his protected activity was a motivating factor in the defendants' decision to retaliate." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citing Perez, 792 F.3d at 783).

The plaintiff's claim fails at the first element because he has not alleged that he engaged in protected conduct. Protected conduct in the prison setting usually involves filing a complaint, grievance or lawsuit about prison conditions or incidents. See Holleman v. Zatecky, 951 F.3d 873, 878 (7th Cir. 2020); Daugherty, 906 F.3d at 610. The plaintiff has not alleged that he engaged in similar conduct. He does not say that he reported an issue at Waupun or filed a grievance or lawsuit for which the defendants targeted him. He says that Weadge mistakenly gave him a memorandum that involved discipline against Weadge. The plaintiff initially asked staff about the memo before destroying it. The plaintiff says that the officers harassed him to keep him from discussing the memo or because they did not believe that he had destroyed it. The plaintiff's actions in reporting and then destroying the misdelivered memo were not protected conduct because he was not authorized

to have the memo and did not have a right to share its contents, the way he *does* have a right to file a grievance or lawsuit about an issue at the prison. The plaintiff cannot state a First Amendment claim based on this conduct.

The plaintiff alleges that the officers acted in "concert with each other" to violate his rights. This suggests that the plaintiff wants to assert a claim that the defendants conspired to violate his rights. Conspiracy is not an independent basis of liability under §1983. Smith v. Gomez, 550 F.3d 613, 617 (7th Cir. 2008) (citing Cefalu v. Village of Elk Grove, 211 F.3d 416, 423 (7th Cir. 2000)). To state a claim of conspiracy, the plaintiff must allege facts showing "that the defendants agreed to inflict the constitutional harm" and then in fact inflicted harm by violating his constitutional rights. Hurt v. Wise, 880 F.3d 831, 842 (7th Cir. 2018). But as the court explained above, the amended complaint does not state a claim against the defendants who he says worked together to harass him. That means the plaintiff does not have a viable conspiracy claim.

The plaintiff separately alleges that Weadge violated his rights by opening his legal mail, canceling a previously-scheduled Zoom call with his mother and issuing him false conduct reports. Even if these allegations could state potential claims, they involve incidents that are unrelated to the plaintiff's allegations about the misdelivered memorandum. In this lawsuit, the plaintiff cannot bring claims about Weadge's conduct that are unrelated to the claims against the other defendants. See Wheeler v. Wexford Health Sources, Inc., 689 F.3d 680, 683 (7th Cir. 2012); George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007). If the

13
Case 2:25-cv-00137-PP   Filed 07/23/25   Page 13 of 19   Document 15

plaintiff believes that Weadge violated his constitutional rights in other ways, he must bring separate lawsuits about Weadge's other alleged actions.

The plaintiff does not state a claim against Boughton, Cirian or Brown. He alleges that he wrote to these defendants about Weadge's conduct, and that only Boughton responded (and dismissed his concerns). But the plaintiff has not alleged that these defendants were personally involved in the alleged harassment, searches or retaliation. They cannot be held liable for their "inaction following receipt of a complaint about someone else's conduct." Estate of Miller by Chassie v. Marberry, 847 F.3d 425, 428–29 (7th Cir. 2017) (warden who "brushed off [incarcerated person's] complaints, leaving them to be handled through the chain of command" not liable under §1983). Even if these defendants had an obligation to step in and correct unlawful behavior, the court has explained above that the other defendants' actions did not violate the plaintiff's rights. That means that there was no conduct that Boughton, Cirian or Brown can be held liable for failing to intervene and stop. See Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation").

Nor does the amended complaint state a claim against Brown Lucas. The plaintiff's only allegations against Brown Lucas are that he told the plaintiff that he would talk to the security director about getting one of Weadge's false conduct reports dismissed. This suggests that Brown Lucas was attempting to *help* the plaintiff rather than to hurt or harass him. Nothing about these scant

allegations suggests that Brown Lucas did or failed to do anything that violated the plaintiff's rights.

The plaintiff may not proceed against Ray and Boyer. The plaintiff says that Ray and Boyer failed to investigate his claims and falsified documents related to his grievances, though he does not say what those documents were. But even if he had explained what the documents were, incarcerated persons have no federal right to meaningful review of grievances, including an investigation into their allegations. See Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996); Steinke v. Dittmann, Case No. 17-cv-656, 2020 WL 470145, at *3 (E.D. Wis. Jan. 29, 2020). The plaintiff cannot proceed on a claim against Ray or Boyer for how they allegedly handled or mishandled the plaintiff's grievances. See Owens v. Hinsley, 635 F.3d 950, 953 (7th Cir. 2011).

The amended complaint does not state a claim. But it is possible that with additional information, the plaintiff could state a claim related to the allegedly unlawful strip search. The court will allow the plaintiff **a final opportunity** to amend his complaint but ***only as it relates to the alleged strip-search***. The plaintiff may not amend his complaint again related to his allegations about the harassment, retaliation, cell search or any other allegations that the court concluded above do not state a claim.

When writing his second amended complaint, the plaintiff should provide the court with enough facts to answer the following questions: 1) Who violated his constitutional rights?; 2) What did each person do to violate his rights?; 3) Where did each person violate his rights?; and 4) When did each person

violate his rights? The plaintiff's second amended complaint does not need to be long or contain legal language or citations to statutes or cases, and he does not need to attach exhibits in support of his claims. But his second amended complaint does need to provide the court and each defendant with notice of what each defendant allegedly did or did not do to violate his rights.

The court is enclosing a copy of its amended complaint form and instructions. The plaintiff must write "Second" above the word amended at the top of the first page. He must list the case number for this case on the first page. He must list all the defendants he wants to sue in the caption of the second amended complaint. He should use the spaces on pages two and three to explain the key facts that give rise to the claims he wishes to bring and to describe which defendants he believes committed the violations that relate to each claim. If there is not enough space on those pages, the plaintiff may use up to five additional sheets of paper, double-spaced so that the court can read them. The second amended complaint takes the place of the prior complaints and must be complete by itself. The plaintiff may not refer the court back to his previous complaints. He instead must repeat in the second amended complaint any of the facts from the previous complaints that he believes are necessary to his claims.

### III. Conclusion

The court **GRANTS** the plaintiff's first motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES AS UNNECESSARY** the plaintiff's second motion for leave to proceed without prepaying the filing fee. Dkt. No. 13.

The court **ORDERS** that the plaintiff may file a second amended complaint that complies with the instructions in this order. If the plaintiff chooses to file a second amended complaint, he must do so in time for the court to *receive* it by the end of the day on **August 29, 2025**. If the court receives a second amended complaint by the end of the day on August 29, 2025, the court will screen the second amended complaint as required by 28 U.S.C. §1915A. If, by the end of the day on August 29, 2025, the court does not receive a second amended complaint by the deadline, or it receives a second amended complaint that does not comply with the court's instructions in this order, the court will dismiss this case based on the plaintiff's failure to state a claim in his amended complaint and will issue him a strike as required by 28 U.S.C. §1915(g).

The court **ORDERS** that the agency that has custody of the plaintiff must collect from his institution trust account the **$348.33** balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the plaintiff's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The agency must clearly identify the payments by the case name and number. If the plaintiff transfers to another county, state or federal institution, the

transferring institution must forward a copy of this order, along with the plaintiff's remaining balance, to the receiving institution.

The court will send a copy of this order to the Warden at Waupun Correctional Institution, where the plaintiff is confined.

The court **ORDERS** that plaintiffs who are incarcerated at Prisoner E-Filing Program institutions[1] must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs who are incarcerated at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the Clerk of Court of any change of address. The court advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court

---

[1] The Prisoner E-Filing Program is mandatory for all persons incarcerated at Green Bay Correctional Institution, Waupun Correctional Institution, Dodge Correctional Institution, Wisconsin Secure Program Facility, Columbia Correctional Institution, and Oshkosh Correctional Institution.

advised of his address may result in the court dismissing this case without further notice.

Dated in Milwaukee, Wisconsin this 23rd day of July, 2025.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**